**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

FILED

2020 JAN 10   A 8: 33

|  |  |
|---|---|
| APOLLO ENTERPRISE IMAGING CORP. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil No. 1:19-cv-1603 (LMB/MSN) |
| | ) |
| JAMES MICHAEL CONYERS, | )  **PUBLIC VERSION** |
| | ) |
| Defendant. | ) |
| | ) |

## COMPLAINT

Plaintiff, Apollo Enterprise Imaging Corp. ("Apollo" or "Plaintiff"), through its undersigned counsel, for its Complaint against Defendant James Michael Conyers ("Conyers" or "Defendant") alleges, based upon its knowledge, information, and belief formed after a reasonable inquiry, as follows:

## NATURE OF THE ACTION

1.      This is an action by Apollo Enterprise Imaging Corp., a global healthcare information technology company, against its former Chief Product Officer for breach of his Confidentiality and Inventions Agreement and theft of trade secrets. Apollo seeks, *inter alia*, an *ex parte* order for civil seizure pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(2)(A)(ii).

2.      Conyers, upon accepting employment with Apollo in 2017, executed a Confidentiality and Inventions Agreement ("Agreement") in which he: (i) assigned to Apollo ownership of any and all "Inventions" (i.e., ideas, designs, software, etc.) conceived or reduced to practice by Conyers during his employment, (ii) agreed to maintain written records of all such Inventions and make them available to Apollo at all times, (iii) promised not to misuse Apollo's

**FILED UNDER SEAL**

confidential information and to return it upon termination of his employment, and (iv) covenanted that he would not solicit, divert, or appropriate any of Apollo's customers, prospects, or collaborative partners for one year following termination of his employment.

3.      After working at Apollo for two years, Conyers voluntarily resigned his position on October 17, 2019, effective immediately.   Upon accepting Conyers' resignation, Apollo reminded Conyers of his obligations under the Agreement, and requested that he return any and all information and files pertaining to Apollo's business.

4.      Conyers assured Apollo on multiple occasions in writing, including in a signed letter, that he had returned all Apollo information in his possession.  But Conyers refused to tell Apollo the identity of his new employer.

5.      After conducting a preliminary investigation suggesting that Conyers did <u>not</u> return all of Apollo's information, and after learning of Conyers' new position as Vice President and General Manager of Konica Minolta's Healthcare IT Business, Apollo engaged a third-party expert to conduct a forensic computer analysis of the laptop computer that Apollo provided Conyers during his employment, which he had surrendered to Apollo on October 2, 2019 ("Laptop") and a thumb drive ("Thumb Drive") which Conyers delivered to Apollo on October 22, 2019, on which he professed to return all Apollo information in his possession.  The results of the forensic analysis show that, over a period of several months, including immediately prior to resigning from Apollo, Conyers copied massive amounts of Apollo's highly confidential, proprietary information to certain specifically identifiable external devices.

6.      Such information -- which is everything necessary to enable Conyers to quickly and easily redevelop Apollo's key products for the benefit of a direct competitor -- includes:

**FILED UNDER SEAL**

a) a full copy of Conyers' entire Outlook pst files (both active and archived), from 2017 to 2019 containing, *inter alia*, technical product information and plans, responses to requests for proposals from potential customers, and direct customer contact information;

b) a full copy of a virtual machine (i.e. computer server) containing Apollo's highly confidential and proprietary installation and demonstration software of its key arcc® software product offering, which Apollo only presents to prospective clients who execute license agreements which include non-disclosure provisions, and which Conyers could use to reverse engineer Apollo's entire arcc® product;

c) detailed arcc® product development, product designs, software roadmaps, and testing information;

d) detailed customer and prospective customer information, including, *inter alia*, responses to requests for proposals to prospective customers, customized product specifications, and pricing, customer "pain points," budgets, and plans; and

e) detailed information from Apollo's software building platform that included, *inter alia*, Apollo's software roadmap, product features, product requirements, issues regarding products that were raised in testing, future product features, designs, and specifications, and future software roadmap.

7.      In addition, the forensic analysis shows that Conyers is in possession of substantial amounts of Apollo's confidential proprietary and technical information which he either never uploaded to Apollo's systems (as he was required to do), or purposefully deleted therefrom.

FILED UNDER SEAL

8.      Finally, the forensic analysis shows that Conyers deliberately and deceitfully withheld such information from Apollo when he claimed to return everything in his possession on the Thumb Drive.  First, the Thumb Drive contained only a handful of files as compared to the vast amounts of information he had copied from Apollo's systems.  Second, the forensic analysis shows that Conyers deleted certain Apollo documents from the Thumb Drive immediately before sending it to Apollo.

9.      As a result of Conyers' flagrant violation of the Agreement and misappropriation of Apollo's trade secrets, Apollo will suffer immediate and irreparable harm unless the Court grants relief *ex parte* under the Defend Trade Secrets Act, ordering the seizure of the devices in Conyers' possession which contain Apollo's confidential, proprietary information before Conyers has notice and opportunity to make additional copies and/or delete or destroy Apollo's files.

## THE PARTIES

10.     Plaintiff Apollo Enterprise Imaging Corp. is a Delaware corporation with its principal offices located at 8245 Boone Blvd., Suite 620, Tysons, Virginia.

11.     Defendant James Michael Conyers is an individual who, upon information and belief, maintains his permanent residence at ███████████ Wellington, Colorado, ███.

## JURISDICTION AND VENUE

12.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1331, because this action involves a claim arising under the laws of the United States, specifically, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832 *et seq.*  Supplemental jurisdiction applies under 28 U.S.C. § 1367 because all other claims are so related that they form part of the same case or controversy.

FILED UNDER SEAL

13.    This Court has personal jurisdiction over Conyers, and venue is proper in this District, because the Agreement at issue in this action provides for personal jurisdiction and venue in any state or federal court within the Commonwealth of Virginia, and because a substantial part of the events giving rise to Plaintiff's claim occurred in Tysons, Virginia.

## FACTS COMMON TO ALL CLAIMS

### Apollo's Business and Its Confidential, Proprietary Information

14.    Apollo is a cutting-edge healthcare information technology company with headquarters in Tysons, Virginia and offices in Fort Collins, Colorado.

15.    Founded in 1993, Apollo emerged as a recognized leader in telepathology, holding exclusive licenses on two patents that cover any system or method utilizing a remote-controlled robotics microscope to make a pathology diagnosis.

16.    In 2006, Apollo developed a comprehensive picture archiving and communication system ("PACS") solution for digital pathology, enabling hospitals and health systems to quickly and efficiently store and access digital images from multiple sources such as microscope-based mounted cameras, gross imaging stands, autopsy cameras, and electron microscopy.

17.    In 2009, Apollo introduced Apollo EPMM® (Enterprise Patient Multimedia Manager), an enterprise solution that provides clinical workflow and secure access and management of all clinical multimedia content across the enterprise. Apollo EPMM brought a clinically-focused Vendor Neutral Archive (VNA) solution to the market.

18.    At the 2017 Scientific Assembly and Annual Meeting of the Radiological Society of North America ("RSNA 2017"), Apollo launched its next generation VNA and clinical application suite, arcc® (Apollo Repository for Clinical Convergence).  arcc® is an industry-leading, holistic enterprise imaging and management solution. The arcc® solution provides the

FILED UNDER SEAL

clinical workflow and secure access and management of all clinical multimedia content across the enterprise.

19.    Apollo solutions assist clinicians in the delivery of quality healthcare services to patients at leading academic centers, regional medical networks, commercial laboratories, and community hospitals throughout the United States and Canada.

20.    Apollo has invested substantial amounts of time, research, scientific and technological know-how, and financial resources to develop its cutting-edge, proprietary products.

21.    Apollo's products derive substantial independent economic value from not being generally known or readily ascertainable by Apollo's competitors.  Each sale of Apollo's product is priced pursuant to the client's customized specifications. ████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████

22.    Apollo's client contracts and its responses to Requests for Proposals ("RFPs") are highly confidential because, *inter alia*, they are extensively negotiated based upon the customer's particular needs, contain non-public budget and planning information from the prospective client, and because they are part of a competitive bidding process.  The RFP responses contain strict confidentiality provisions that preclude both parties from disclosing even the existence of the prospective business relationship – let alone the contents of the proposal – without the other party's prior consent.

23.    The strategic, proprietary information described above is not generally known to the public and would not be ascertainable without the expenditure of substantial time, effort, and

**FILED UNDER SEAL**

resources. Such information is extremely valuable to Apollo, and it would be equally valuable to Apollo's competitors.

24.    Apollo does not share its confidential, proprietary information with the public or anyone outside the company, except as necessary for clients who enter into licensing agreements requiring the client to maintain strict confidentiality, and for prospective clients who enter into non-disclosure agreements with Apollo.

25.    Apollo takes other steps to guard its confidential, proprietary information, including requiring employees, contractors, and partners to execute confidentiality agreements with restrictive covenants designed to safeguard Apollo's protectable interests, restricting access to employees on a need-to-know basis, and maintaining secure computer systems, secure cloud-based computing, and locked offices.

**Conyers' Employment with Apollo**

26.    By letter dated July 21, 2017 ("Offer Letter"), Apollo offered Conyers the position of Chief Product Officer (CPO). The Offer Letter stated that Conyers would be exposed to information considered confidential by the company, and that Conyers would be required to sign a confidentiality agreement upon accepting employment.

27.    Conyers countersigned the Offer Letter and dated it July 24, 2017. A copy of the executed Offer Letter is attached hereto as **Exhibit A**.

28.    Conyers began working for Apollo on August 1, 2017. In connection with accepting employment, Conyers executed the Agreement, attached hereto as **Exhibit B**.

29.    In the Agreement, Conyers acknowledged the proprietary and confidential nature of the information he would become privy to and help develop, and covenanted not to use or disclose such information except as expressly authorized by and for the benefit of Apollo:

7

FILED UNDER SEAL

1. <u>Confidentiality.</u>

(a) <u>Company Competence.</u>    I acknowledge and agree that Company's ongoing operations are the direct result of Company's special competence in its field of endeavor, and that such ongoing operations depend directly on Company's ownership and possession of confidential and proprietary information, not generally known to others, including specialized information about research, development, production, marketing and management in Company's field of endeavor (collectively "Confidential Information' as further defined below).

(b) <u>Protection of Confidential Information.</u>  I acknowledge that in the course of my employment, I will have access to and gain possession of Confidential Information owned by and proprietary to Company. Accordingly, I agree as follows:

(i)    I will at all times take reasonable steps to protect the confidential and proprietary nature of, Confidential Information, and prevent inadvertent or unauthorized disclosure of the same; and

(ii)   I will not use or copy any Confidential Information for any purpose or disclose Confidential Information to any person or entity (A) during my employment, except as expressly authorized by and for the benefit of Company and in the course of my duties as an employee of Company, and (B) at any time or for any reason after my employment ends; and

(iii)  All Confidential Information is, and will remain, at all times the exclusive properly of Company. All Confidential Information in my possession will be held by me for Company's benefit and enjoyment. ***If and when my employment by Company is terminated for any reason or upon the request of Company, I will promptly return all Confidential Information in my possession to Company.***

Ex. B, ¶ 1(a)-(b) (bold, italics added).

30.    Conyers further assigned to Apollo all ownership interest in any and all work product developed by Conyers during his employment, as follows:

2. <u>Inventions</u>
(a)(1) <u>Company Ownership.</u>  Any and all inventions, original works of authorship, developments, concepts, improvements, trade secrets, ideas, processes, procedures, systems, discoveries, designs,

**FILED UNDER SEAL**

configurations, computer data, software, firmware, microcode, or technology, (whether or not patentable, copyrightable and/or trademarkable), whether or not made, conceived or reduced to practice during working hours or using Company equipment, computers, data or facilities (collectively, "Inventions"), which I have made, conceived, invented discovered reduced to practice, or acquired during my employment or which I make, conceive, invent, discover, reduce to practice, or acquire subsequently during my employment by Company, either alone or with others with others, and which are related to Company's present or planned business, ***shall be solely owned by Company***. If, and to the extent applicable, such Inventions will be deemed to be "works-made-for-hire."

(a)(2) <u>Assignment of Inventions</u>. ***I agree to assign***, and hereby do assign, to Company all rights, ***title and interest in and to any Inventions***, whether or not patentable or registrable under patent copyright, or similar laws relating to intellectual property rights, which I, alone or with others, may conceive, develop or reduce to practice (constructively or otherwise) during my past or future employment with Company or its predecessors or successors in interest including the right to sue for past damages. ***If I incorporate in a Company product, process, computer program, computer program product, or machine, a prior invention owned by me or in which I have an interest Company is hereby granted a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license*** to make, have made, modify, reproduce, distribute, use, import, license, sell, and offer to sell any such prior invention as part of, or in conjunction with such produce process, computer program, computer program product or machine.

Ex. B, ¶ 2(a) (bold, italics added).

31.    In addition, the Agreement provides that Conyers must "maintain adequate and current written records of all such Inventions (in the form of notes, sketches, drawings, charts and as may be specified by [Apollo]), which records shall be available to and remain the sole property of [Apollo] at all times." *Id.*, ¶ 2(b).

32.    During his two-year tenure at Apollo, Conyers -- as Chief Product Officer -- was intimately involved with the development of the arcc® software product, including the latest version that was scheduled for release in September 2019, in anticipation of the 2019 Scientific

9

**FILED UNDER SEAL**

Assembly and Annual Meeting of the Radiological Society of North America ("RSNA 2019") to be held later in the year.

**<u>Conyers' Increasing Volatility and Performance Issues</u>**

33.    Beginning in or about early 2019, Apollo management became increasingly concerned about Conyers' work performance and belligerent conduct toward his colleagues and superiors.

34.    On February 14, 2019, while attending the Global Conference & Exhibition of the Healthcare Information and Management Systems Society ("HIMSS"), Conyers became verbally abusive with Apollo management and sales force members at a hotel lobby bar, over Conyers' apparent dissatisfaction with his colleagues' general attitude.

35.    Apollo management had several discussions with Conyers regarding the incident at HIMSS in an effort to correct and improve Conyers' interactions with his colleagues, but Apollo took no disciplinary action against him.

36.    On June 14, 2019, Conyers became volatile during a telephone conversation with Apollo CEO Mark Newburger ("Newburger"), concerning Conyers' demands for additional compensation and his insistence that he not be held accountable for meeting certain company goals and benchmarks.

37.    As a result of the volatility Conyers displayed during the June 14, 2019 phone call, and believing Conyers was likely to resign abruptly from the company, Apollo suspended Conyers' access to its computer systems for several days, although Conyers (who was traveling on business at the time) remained in possession of the Laptop. Apollo has recently learned that Conyers engaged in massive file copying, or "exfiltration," during this time.

**FILED UNDER SEAL**

38.     Conyers did not resign in June 2019, but he stated that he no longer wished to be responsible for anything but his "core responsibilities," and that he would immediately begin transitioning duties, such as sales management, quality testing, and engineering, to other personnel and departments.    Apollo accommodated Conyers' wishes, without making any negative adjustments to his title, status, or compensation with the company.

39.     On September 16, 2019, Newburger had a scheduled telephone meeting with Conyers regarding his performance issues relating to the anticipated release of the new arcc® software version 10.1 ("arcc v10.1"), specifically concerning Apollo's expectations about the level of sales support Conyers would provide.  The call seemed to be productive and amicable, although Conyers refused to participate by videoconference as had been planned.

**Apollo's Intellectual Property Audit and Conyers' Erratic Conduct in Response**

40.     In or about early September 2019, in anticipation of releasing arcc v10.1, Apollo engaged outside patent counsel, Ray Werner, Esq. ("Werner"), to conduct an intellectual property audit ("IP Audit") to, *inter alia,* catalog work product that may contain patentable, copyrightable, or trade secret information.

41.     On September 25, 2019, Werner shared with Apollo his interim conclusion that Conyers was not meeting his obligations under paragraph 2(b) of the Agreement to keep, maintain and provide adequate and current written records, and that Conyers' failure to document his intellectual work product was much more than an incidental lapse in record keeping.

42.     On September 26, 2019, Apollo management decided to terminate Conyers' employment as a result of performance and conduct issues, the culmination of which was Conyers' failure to properly document the company's intellectual property.  Apollo did not notify Conyers of the decision at that time.  Rather, Newburger determined that he should travel to Fort Collins to

**FILED UNDER SEAL**

notify Conyers in person, and made arrangements to fly to Colorado the following Wednesday, October 2, 2019.

43.     Newburger informed Conyers that he wanted to meet with him in Fort Collins on October 2, 2019, but did not notify Conyers that his intention was to terminate Conyers' employment during that meeting.

44.     On Friday, September 27, 2019, Newburger and Conyers had an email exchange in which Conyers expressed excitement about his progress on company projects and indicated he was looking forward to discussing "a lot of great ideas and potential" during the October 2, 2019 in-person meeting:

> **From:** Jim Conyers <jconyers@apolloei.com>
> **Sent:** Friday, September 27, 2019 2:19 PM
> **To:** Mark J. Newburger <mnewburger@apolloei.com>
> **Subject:** RE: HIIE
>
> Hey Mark,

1

> Yes, we can discuss next week when you are in Fort Collins, I think that would be most productive. I believe there are a number of great things that can be done. This really got my creativity going. A lot of great ideas and potential. Only Healthcare company present at the Advisory meeting this week.
>
> **James Conyers**
> **Chief Product Officer**
> Apollo

45.     Later in the afternoon of September 27, 2019, Newburger emailed Conyers asking for specific information requested by Werner in furtherance of the IP Audit. A true copy of Newburger's email is copied below:

12

**FILED UNDER SEAL**

From: Mark J. Newburger <mnewburger@apolloei.com>
Sent: Friday, September 27, 2019 3:35:16 PM
To: Jim Conyers <jconyers@apolloei.com>
Subject: FW: IP Audit // Request for Info // 27 SEP 2019

Dear Jim,

Ray Werner, Apollo's new IP Attorney who is conducting an IP Audit for us, has asked me for the below information. Where would I find the Product management parts of the below? I am confident aha has much of the current product specification, but we also needs notes, drawings etch for current and future plans. I would appreciate if you would send me the links (or electronic copies) for each of the products so I can then share these documents with Ray. Ray is hoping to working on this during the weekend and early next week so would like this by Monday morning at the latest.

Thanks in advance.

Sincerely,

Mark

Mark J. Newburger
President & CEO
Apollo Enterprise Imaging Corp

46.     Conyers replied within the hour as follows:

From: Jim Conyers <jconyers@apolloei.com>
Sent: Friday, September 27, 2019 4:17 PM
To: Mark J. Newburger <mnewburger@apolloei.com>
Subject: Re: IP Audit // Request for Info // 27 SEP 2019

Hey mark will review on the plane and get back to you before Monday for sure.

sent from mobile device

47.     Conyers never responded substantively to Newburger's request for documentation in furtherance of the IP Audit.

48.     Instead, on Tuesday, October 1, 2019, Conyers sent Newburger a lengthy email claiming that he was the subject of ongoing retaliation by Apollo because he purportedly voiced concerns ██████████████████████. This was the first time Conyers ever made an allegation of purported retaliation.

49.     Unbeknownst to Apollo, Conyers spent the weekend preceding the scheduled October 2, 2019 meeting using his company Laptop to copy onto his personal external computer storage media (i.e., "exfiltrate") essentially every company file to which he had access, including:

13

**FILED UNDER SEAL**

a) Conyers entire archived and active Outlook pst files, from Conyers's first date of employment on August 1, 2017 until his resignation in October 2019, which includes, *inter alia*, the following highly sensitive and confidential information: (i) technical information regarding Apollo's products (*e.g.*, product descriptions, product plans, software roadmaps, diagrams, and technical discussions about product testing); (ii) responses to RFPs from prospective clients (containing *e.g.*, product specification information, pricing information, the potential customer's "pain points," and non-public information regarding the potential customer's budget and plans); (iii) direct client contact information; and (iv) interactions with clients, prospective clients, and partners;

b) a full copy of a virtual machine (which is essentially an entire company server) containing Apollo's highly confidential and proprietary installation and full demonstration software of its key arcc® software product offering, which Conyers could use to reverse engineer Apollo's product, thus enabling him to build a similar software product for a competitor or build a software product that he could then claim as his own, including in the form of an application for a utility patent before the United States Patent and Trademark Office;

c) detailed arcc® product development and testing information, software design files, and software roadmaps;

d) detailed highly sensitive and confidential customer information, including, *inter alia*, customers' direct contact information, as well as comprehensive proposals and responses to RFPs (containing *e.g.*, customized product specifications,

14

**FILED UNDER SEAL**

pricing information, the potential customer's "pain points," and non-public

information regarding customers' budgets and plans); and

e) screen captures from the Aha!, Apollo's software building platform. These

screen shots would contain highly confidential proprietary information,

including, among other things, Apollo's software roadmap, product features,

product requirements, issues regarding products that were raised in testing,

future product features, designs, and specifications, and future software

roadmap.

50.    Conyers' massive copying continued through the evening of Monday, October 1,

2019.  The last file interaction between Conyers' company Laptop and his personal external

devices involved files titled "Sample_Severance_Agreement" and "Severance-Agreement-

Template" in the late evening of October 1, 2019 and early morning of October 2, 2019 (times

noted are Greenwich Mean Time, and Conyers' is located in Colorado, seven hours behind GMT):

| | | |
|---|---|---|
| 10/2/2019 14 03:12 E:\llm\Sample_Severance_Agreement.DOC | File/Folder Interaction | Generic External Drive (Volume Serial: da95-4ec4) |
| 10/2/2019 3:48:12 E:\llm\Severance-Agreement-Template.docx | File/Folder Interaction | Generic External Drive (Volume Serial: da95-4ec4) |
| 10/2/2019 3:27:43 E:\llm\Sample_Severance_Agreement.DOC | File/Folder Saved | Generic External Drive (Volume Serial: da95-4ec4) |
| 10/2/2019 2 58:10 E:\llm\Severance-Agreement-Template.docx | File/Folder Saved | Generic External Drive (Volume Serial: da95-4ec4) |

51.    Also unbeknownst to Apollo, Conyers had been applying for other employment

positions since mid-June 2019, including the position he currently has as Vice President and

General Manager of Konica Minolta's Healthcare IT Business, which he appears to have initially

applied for on or around July 10, 2019.

**Apollo's Placement of Conyers on Paid Administrative Leave**

52.    Conyers' October 1, 2019 email concerning purported retaliation was utterly

unexpected and appeared to be a pretextual effort on Conyers' part to avoid termination.

**FILED UNDER SEAL**

53.     Nevertheless, Apollo took the content of the email extremely seriously and placed Conyers on paid administrative leave while it investigated the allegations, rather than terminating his employment.

54.     On October 2, 2019, during the previously scheduled meeting in Colorado, Newburger notified Conyers of the decision to place him on paid administrative leave, and required Conyers to turn over the Laptop immediately.

55.     Apollo locked Conyers out of any and all company computer systems, including email, at approximately 3:00 p.m. MST on October 2, 2019.

56.     Apollo immediately undertook an investigation of Conyers' allegations of retaliation and of his purported concerns, as expressed in the October 1, 2019 email, ▆▆▆▆

▆▆▆▆▆▆▆▆▆

57.     In his October 1, 2019 email, Conyers claimed to have "capture video, audio and all records outlining…communications" he purportedly had regarding his ▆▆▆▆ concerns.

58.     By email dated October 14, 2019, Newburger informed Conyers that the "company has decided to engage outside advisors to conduct a review and evaluation of the arccV10.1 product, which will include both legal/regulatory aspects and product evaluation and related technical aspects."

59.     In his October 14, 2019 email, Newburger requested that Conyers provide all of the "materials, logs, reports, capture video, and audio recordings," and any other notes or records in Conyers' possession relating to any concerns he had regarding ▆▆▆▆▆▆ Newburger directed Conyers to work directly with Apollo's outside experts to assist in their review as expeditiously as possible.

16

**FILED UNDER SEAL**

60.    Conyers initially indicated he would cooperate with the audit.  On October 15, 2019, Conyers indicated a family emergency prevented him from scheduling a call right away, but the following day he agreed to speak with Apollo's outside legal consultant, William McGrath, Esq., by telephone on October 21, 2019.

61.    Conyers ultimately would not follow through with his promise of cooperation, and he never provided the documentation Apollo requested in furtherance of the purported concerns Conyers himself raised.

**Conyers' Resignation and Demand for Severance**

62.    On October 17, 2019, Conyers voluntarily and unexpectedly tendered his written resignation via email to Newburger, a copy of which is attached hereto as **Exhibit C**.

63.    One minute after sending his resignation email, Conyers followed with another email to Newburger demanding a severance package.  In exchange, he offered not to disparage Apollo ███████████████████████████████████████████ ███████ and not to make any "social media post or anything that would present negatively for/about Apollo."  The import of the email was that if Apollo did not accede to Conyers' demand for payment, he would follow through with these threatened actions.  A copy of email exchanges between Conyers and Apollo's counsel regarding Conyers' "exit strategy" demands is attached hereto as **Exhibit D**.

64.    Apollo had no interest in considering Conyers' demand and viewed it as an attempt to coerce additional compensation from Apollo based on hollow allegations which Conyers refused to substantiate despite his purported ██████ concerns.

### FILED UNDER SEAL

65.     Apollo accepted Conyers' resignation via email dated October 18, 2019, reminded

him of his obligations under the Agreement, and attached a copy of the Agreement for Conyers'

reference.  A copy of Newburger's October 18, 2019 email is attached hereto as **Exhibit E.**

66.     Through its outside employment counsel, Catherine Guttman-McCabe, Esq.,

Apollo responded to Conyers' severance demand with a notice to preserve evidence, in light of the

dispute Conyers raised concerning his demand for compensation to which he was not otherwise

entitled.  *See* Exhibit D.

67.     In her October 18, 2019 email, Guttman-McCabe reminded Conyers of his

obligation to return any and all information belonging to Apollo, as follows:

> You are contractually bound to protect the Company's confidential
> and proprietary information, which remains the exclusive property
> of the Company. I understand that your resignation occurred while
> there were unanswered requests from the Company for proprietary
> information in your possession. You must return any Company
> property and confidential information and are prohibited from
> destroying it or using it for any unauthorized purpose.

*See id.*

## Conyers' Deceptions Regarding His New Employer and Apollo's Confidential Information

68.     Within a few hours of Guttman-McCabe's demand for the return of Apollo's

property, Conyers replied via email, professing ignorance of any proprietary information he

allegedly had in his possession.

69.     Conyers confirmed he would return Apollo's information, but he (i) demanded that

Apollo *first* identify information it believes Conyers has in his possession, and (ii) stated that he

would only return the information after arriving at a "signed exit solution":

> I have no issue in providing any proprietary information in my
> possession, **although I am not sure what information is being
> referenced.  In order for me to comply Apollo has to provide
> what they believe is in my possession,** I want to make sure I am

FILED UNDER SEAL

not making assumptions and that I understand completely. **If a clear explanation of what is believed to be in my possession and what proprietary information I have I am more then happy to provide at the time that we have an agreed and signed exist [sic] solution matter whatever the final details of that is.**

*See* Exhibit D (emphasis added).

70.    Conyers and Guttman-McCabe had further email exchanges regarding this subject on October 21, 2019.  In these exchanges, Conyers again professed confusion about the return of Apollo's information:

> All I needed to know was what is being asked of me to provide so that I can and be done with this situation.

*See* Exhibit D.

71.    Guttman-McCabe responded:

> You are required to turn over any and all work product and data, files, documents, information, designs, code, etc. pertaining to Apollo and its business during the entire duration of your employment. Once you have done so, please give us written confirmation that you have given us everything.

*See id.*

72.    On October 22, 2019, Conyers finally appeared to comply with Apollo's requests by sending the Thumb Drive to Apollo, claiming it contained all of the Apollo files Conyers had in his possession.

73.    Conyers wrote in a signed letter accompanying the Thumb Drive: "This confirms that I have returned everything that was requested." The signed letter and cover email are attached hereto as **Exhibit F.**

74.    The Thumb Drive contained only a handful of files and there was no indication that Conyers had copied virtually every trade secret Apollo owns, as Apollo would later learn.  The subsequent forensic review of the Thumb Drive established that all these files were placed on the

**FILED UNDER SEAL**

Thumb Drive on October 22, 2019, and that Conyers deleted certain files after initially placing them on the drive.

75.    On or about October 25, 2019, the recruiter who had placed Conyers with Apollo, Janet Skinner, called Newburger to inform him that Conyers had accepted employment with another company. She said she was not at liberty to disclose the new employer's identity, but assured Newburger that it was not a competitor of Apollo.

76.    Three weeks later, Conyers made an unsolicited phone call to Newburger on November 15, 2019, stating that he had, in fact, accepted a job in the industry and proposing a collaboration between Apollo and his new company.

77.    During the call, Conyers explained that the arcc v10.1 software would be an excellent solution to provide a functionality his new employer currently lacks. Conyers refused, however, to identify his new employer -- citing confidentiality obligations pending a press release to announce his new post in late November (although Apollo can find no reference to any such press release online, and Conyers is not even named anywhere on Konica's website, *see, e.g.* https://www.konicaminolta.com/medicalusa/news/press-releases/).

78.    Newburger accepted Conyers' suggestion to meet at RSNA 2019 to be held in Chicago in late November, and sent an email confirming their November 15, 2019 phone call. A copy of Newburger's November 15, 2019 email and Conyers' reply is attached hereto as **Exhibit G.**

79.    In his email, Newburger expressed comfort that Conyers' proposal to collaborate with Apollo suggested that his role at the as-yet unknown competitor was not to develop a competing product with arcc®. *See* Exhibit G. Newburger nevertheless gave Conyers a "heads-

**FILED UNDER SEAL**

up" that Apollo's legal counsel would be following up on various issues, including Conyers' Confidentiality and Inventions Agreement. *See id.*

80.     Conyers replied an hour later, retracting his proposal to meet at RSNA 2019 and collaborate with Apollo, until such time as any remaining issue with the Agreement "is complete and signed off." *See id.*

81.     Thereafter, Apollo accelerated its review of the Thumb Drive, comparing its contents to Conyers' company Laptop and Apollo's company-wide computer systems, to determine whether any files were not returned.

82.     Apollo found that certain documents Conyers should have been expected to return were not included on the Thumb Drive or otherwise provided. Guttman-McCabe emailed Conyers on November 19, 2019, informing him of this, citing specific examples, including poster boards created in the Colorado office depicting software architecture and product specifications. A copy of Guttman-McCabe's November 19, 2019 email and Conyers' reply is attached hereto as **Exhibit H.**

83.     Conyers replied several hours later stating:

> What I provided you on the thumb drive is every thing I had. I do not have anything outside of that in my personal possession. I did not have admin rights to the corporate One note, One Drive, SharePoint or other. In addition, all of those are controlled with version control and controlled by the corporate Admin. Everything I had was in my Apollo onenote, onedrive, sharepoint or on my work computer. My Work Computer was left on my desk. What happen after I left the office I have no idea. I am not sure what else I can provide or explain on the matter. I wish I could be of further assistance.
>
> Next, as for the poster boards, again I apologies I can not be of further assistance but I do not have those poster boards. Those poster boards have zero value or purpose to me. Jeff M allowed Jeff B and Jarred to store their personal furniture, household items, boxes etc throughout the office. As I mentioned before those boards were

**FILED UNDER SEAL**

scattered all throughout the office and among their personal items. I have no idea where those poster boards are. Again, I wish I could be of more assistance.

*See* Exhibit H.

84.     On November 26, 2019, iDiscovery Solutions ("iDS"), an independent computer consultant engaged by Apollo, acquired a forensic image of the Laptop so it could be repurposed while preserving any evidence. iDS also forensically imaged the Thumb Drive. Prior to the forensic imaging, Apollo had preserved both devices secured under lock and key.

85.     Subsequently, Newburger and other Apollo personnel attended RSNA 2019 during the week of December 1-6, where they learned that Conyers' new employment was Vice President and General Manager of Konica Minolta's Healthcare IT Business, a role that placed him in a position to compete directly with Apollo.

86.     Apollo promptly engaged iDS to perform a forensic analysis of the Laptop and the Thumb Drive.

87.     As a result of iDS's analysis, which is ongoing, Apollo has learned that all of the above-described assurances by Conyers were knowingly and deliberately false.

88.     For nearly two months, Conyers has repeatedly:

a)  assured Apollo that he is not in possession of Apollo's trade secret and proprietary information;

b)  feigned a willingness to cooperate with Apollo's requests;

c)  professed confusion and ignorance as to why Apollo would suspect that he would take information that has "zero value or purpose to [him]" (*see* Exhibit H); and,

**FILED UNDER SEAL**

    d) attempted to conceal the identity of his new employer and convince Apollo that he is not in a competing position.

89.    All the while, as shown by the evidence discovered by iDS, Conyers was -- and still is -- in possession of virtually every trade secret and scrap of proprietary information belonging to Apollo.

**Conyers' Conduct Demonstrates Willful Misappropriation and Deception**

90.    The forensic evidence compiled by iDS -- together with Conyers' own actions and communications described above -- demonstrate without a doubt that Conyers' misappropriation of Apollo's trade secrets was deliberate, willful, deceptive, malicious, and for the purpose of furthering Conyers' own personal interests to the detriment of Apollo's.

91.    After learning on the afternoon of September 27, 2019 that Apollo was conducting an IP Audit and requesting missing information from him, Conyers spent the next four days downloading Apollo's key proprietary information to his personal external drives, without Apollo's knowledge or consent.

92.    Conyers' copying during this timeframe included more than 430 file interactions between the Laptop and his personal external devices, in which he copied, among other things (i) all of his active Outlook pst files; (ii) his archived Outlook files dating back to his first day of employment, (iii) the entire executable demonstration software and installation software for Apollo's proprietary arcc® product, (iv) Apollo's responses to customer RFPs; (v) Conyers' own testing notes and design files; and (vi) screen shots of Apollo's product roadmap software "Aha!".

93.    There is no legitimate reason for Conyers to store such information on personal external media. As Apollo's CPO, Conyers had full access to all of Apollo's information via

**FILED UNDER SEAL**

Apollo's computer systems, allowing him to remotely access such information at any time from anywhere in the world.

94.    According to data iDS recovered from the Laptop, in the weeks and months preceding these massive file downloads, Conyers was working on his résumé, his LinkedIn profile, cover letters to prospective employers, and interactions with the recruiter who had placed him at Apollo and who ultimately placed him at Konica Minolta after he left Apollo.

95.    In addition, iDS's analysis showed that this was not the first time Conyers engaged in massive file copying to his personal devices without Apollo's knowledge or consent.

96.    Immediately following Conyers' heated exchange with Newburger on Friday, June 14, 2019 concerning his demands for higher compensation, and under the mistaken impression he was about to be fired, Conyers spent approximately 5.6 hours on Sunday, June 16, 2019 copying massive numbers of Apollo's files to his personal external media.  Analysis of the Laptop shows approximately 1,792 file interactions during that window, for an average of about 5.3 interactions per minute.

97.    A few examples of the massive number of the critical, highly confidential, proprietary files Conyers saved to external media on June 16, 2019 include:

   a) Executive Sales Forecast Meeting 5 2 2019.pdf which provides the list of Apollo prospects, their plans and project budgets;

   b) VM Image files which would enable Conyers to use Apollo's confidential software to reverse engineer it or other unlicensed purposes; and,

   c) RFP responses, specifications, and pricing quotes for multiple major current prospective clients;

**FILED UNDER SEAL**

98.    Near the end of his illicit downloading activity on June 16, 2019, the Laptop shows the following interaction with a file folder titled: *6 16 2019\now\Janet.docx*. Janet Skinner is the recruiter who had placed Conyers with Apollo. Later interactions with these files including the name "Janet" show that this activity relates to job searches, with other identifiers in the file or folder name such as "G:\6 16 2019\Personal\Janet\James M Conyers Resume July 2019.docx," and "G:\6 16 2019\Personal\Janet\Konica\Job Description and Requirements.docx":

99.    A few weeks later, on July 10, 2019, the Laptop shows the following interactions with external media, concerning prospective employment with Konica Minolta, where Conyers began working following his resignation from Apollo:

| | | |
|---|---|---|
| 7/10/2019 13:51:34 G:\6 16 2019\Personal\Janet\Konica | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 13:51:34 G:\6 16 2019\Personal\Janet\Konica\July 2019 - James M Conyers Resume.pdf | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 5:17:14 G:\6 16 2019\Personal\Janet\Konica\GM docx | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 5:17:10 G:\6 16 2019\Personal\Janet\Konica\July 2019 - James M Conyers Resume docx | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 5:16:26 G:\6 16 2019\Personal\Janet\Konica\July 2019 - James M Conyers Resume docx | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 5:14:14 G:\6 16 2019\Personal\Janet\Konica\Job Description and Requirements.docx | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 5:02:47 G:\6 16 2019\Personal\Janet\Konica\July 2019 - James Michael Conyers Cover Letter.docx | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 5:02:24 G:\6 16 2019\Personal\Janet\Konica\July 2019 - James M Conyers Resume.pdf | File/Folder Saved | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 4:59:26 G:\6 16 2019\Personal\Janet\Konica\July 2019 - James Michael Conyers Cover | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 3:51:12 G:\6 16 2019\Personal\James_M_Conyers_Cover Letter_Janet doc | File/Folder Last Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 3:51:12 G:\6 16 2019\Personal\James_M_Conyers_Cover Letter_Janet doc | File/Folder Interaction | Seagate Backup Plus (SN: NA9MA3MV) |
| 7/10/2019 2:37:39 G:\6 16 2019\Personal\Janet\Konica\July 2019 - James Michael Conyers Cover | File/Folder Saved | Seagate Backup Plus (SN: NA9MA3MV) |

100.    The Thumb Drive Conyers used purportedly to return any and all information belonging to Apollo likewise shows evidence of Conyers' intention to deceive Apollo and evade his obligations under the Agreement.

101.    Conyers sent the Thumb Drive under cover letter dated October 22, 2019.

102.    Forensic analysis shows that all of the files returned on the Thumb Drive had been copied to it that very day (October 22, 2019), indicating that he had copied the files from some other device (such as the Seagate Backup Plus external hard drive he previously used to engage in massive copying).

**FILED UNDER SEAL**

103.    iDS was also able to recover information showing that Conyers deleted certain Apollo files after he loaded them on to the Thumb Drive on October 22, 2019.

104.    This shows that Conyers -- in an effort to placate Apollo and make Apollo believe that he was complying with its requests -- copied a small number Apollo files (likely by dragging and dropping folders from other media), and then selectively deleted some of those files that he didn't want Apollo to know he had.

105.    Some of the files Conyers actually returned on the Thumb Drive were substantive and related to Apollo's trade secrets and proprietary information, but the Thumb Drive included only a tiny fraction of what Conyers actually took with him.

## A Seizure Order is Necessary to Prevent Immediate and Irreparable Harm to Apollo

106.    Conyers has repeatedly dissembled, feigned ignorance and cooperation, and given Apollo blatantly false assurances that he is not in possession of Apollo's trade secret information.

107.    Conyers also went to great lengths first to hide the identity of his new employer, and then to convince Apollo that his new company wants to collaborate with Apollo rather than compete with it.

108.    Given Conyers' history of deception regarding this matter, as well as Conyers' computer skills and access to equipment, an *ex parte* seizure order is necessary to prevent the propagation or dissemination of the trade secrets that are the subject of the action.

109.    If Conyers were given notice of Apollo's application for relief, it is highly likely that he would make additional copies of Apollo's trade secrets and destroy or hide the devices Apollo currently knows about.

110.    In addition, forensic evidence shows that Conyers is in possession of a substantial number of Apollo's highly confidential and important documents and information that do not

**FILED UNDER SEAL**

reside anywhere in Apollo's systems or files. Such information relates to, *inter alia*, quality testing of Apollo's products, notes and design files.

111.    Testing notes are part of Apollo's quality management procedures. Any issues found during testing must be addressed, and testing notes also document when testing is successful. Apollo must have Conyers' testing notes so Apollo can document that any and all potential issues have been resolved.

112.    Design files document original and agreed product features built to specification for individual customers of Apollo. As part of its development and quality management processes, Apollo must have Conyers' design files to document any and all iterations of the product and changes made thereto.

113.    In addition, seizure of the identified computer storage devices is necessary to follow the trail of any additional copying by Conyers, such that Apollo's information can be found in locations not yet identified. The devices identified thus far are not only containers for storing information, but they are bridges allowing further dissemination and copying by Conyers to other computers, storage devices, email accounts, and/or cloud storage.

114.    The harm to Apollo if it is not granted a seizure order outweighs the harm to any legitimate interest of Conyers. Conyers has no legitimate need or use for Apollo's documents and information, and the cost of the devices which would be subject to seizure is miniscule compared with the multi-million dollar value of the trade secrets at issue. For example, a Seagate Backup Slim external hard drive -- the principle device Conyers used to copy Apollo's information -- can be purchased for less than $70.00.

115.    There is no indication that any third parties would be harmed by a seizure of the devices Conyers used to copy Apollo's information.

**FILED UNDER SEAL**

116.    The information at issue constitutes Apollo's trade secrets, and forensic evidence shows that Conyers misappropriated these trade secrets.

117.    Conyers has actual possession of the trade secrets and the property to be seized.

118.    Apollo's computer forensic consultant, iDS, has described with reasonable particularity the physical devices to be seized, as follows:

| Device Name | Identifier |
|---|---|
| Western Digital My Passport | SN: 57584531413231533438383833 |
| Seagate Backup Slim | SN: NA9MA3MV |
| Dell Portable Disk | SN: NA53Z080 |
| Kingston DT 101 G2 | SN:001cc0c60e20cbb1242923c9 |
| Western Digital My Passport 0740 | SN: 575844314539314c59544a35 |
| Kingston DataTraveler 2.0 | SN: 1c6f6581fdf7ed91d90e00c0 |
| WD My Passport 07A8 | SN: 57584331413932343833393 |
| Generic External Drive | SN: d56b1ac1 |
| Generic External Drive | SN: 47349433 |
| Generic External Drive | SN: 7ce4032e |
| Generic External Drive | SN: 0064e1f6 |
| Generic External Drive | Volume Serial: da95-4ec4 |

119.    It is highly likely that Conyers maintains the external drives and other computer devices at his home at ███████████, Wellington, Colorado, ████.

120.    If Apollo were to provide notice of the instant action and its intention to seek return of Apollo's information through court proceedings, Conyers would destroy, move, hide, or otherwise make such matter inaccessible to the court.

121.    Apollo has not publicized the requested seizure.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

122.    Apollo incorporates the allegations in the preceding paragraphs of this Complaint as if fully set forth below.

**FILED UNDER SEAL**

123.    Conyers entered into a valid and enforceable Agreement with Apollo whereby he (i) assigned to Apollo ownership of any and all "Inventions" (i.e., ideas, designs, software, etc.) conceived by Conyers during his employment, (ii) agreed to maintain written records of all such Inventions and make them available to Apollo at all times, (iii) promised not to misuse Apollo's confidential information and to return it upon termination of his employment, and (iv) covenanted that he would not solicit, divert, or appropriate any of Apollo's customers, prospects, or collaborative partners for one year following termination of his employment. *See* Exhibit B, ¶¶ 1, 2, 4.

124.    In addition to the previously quoted provisions of the Agreement, Conyers agreed as follows:

> 2. Inventions
>
> (a)(1) Company Ownership. Any and all inventions, original works of authorship, developments, concepts, improvements, trade secrets, ideas, processes, procedures, systems, discoveries, designs, configurations, computer data, software, firmware, microcode, or technology, (whether or not patentable, copyrightable and/or trademarkable), whether or not made, conceived or reduced to practice during working hours or using Company equipment, computers, data or facilities (collectively, "Inventions"), which I have made, conceived, invented discovered, reduced to practice, or acquired during my employment or which I make, conceive, invent, discover, reduce to practice, or acquire subsequently during my employment by Company, either alone or with others, and which are related to Company's present or planned business, shall be solely owned by Company. If, and to the extent applicable, such Inventions will be deemed to be "works-made-for-hire."
>
> (a)(2) Assignment of Inventions. I agree to assign, and hereby do assign, to Company all rights, title and interest in and to any Inventions, whether or not patentable or registrable under patent, copyright, or similar laws relating to intellectual property rights, which I, alone or with others, may conceive, develop or reduce to practice (constructively or otherwise) during my past or future employment with Company or its predecessors or successors in interest including the right to sue for past damages. If I incorporate

**FILED UNDER SEAL**

in a Company product, process, computer program, computer program product, or machine, a prior invention owned by me or in which I have an interest Company is hereby granted a non-exclusive, royalty free, irrevocable, perpetual, world-wide license to make, have made, modify, reproduce, distribute, use, import, license, sell, and offer to sell any such prior invention as part of, or in conjunction with such product, process, computer program, computer program product or machine.

(b) Maintenance of Records. I agree to keep and maintain adequate and current written records of all such Inventions (in the form of notes, sketches, drawings, charts and as may be specified by Company), which records shall be available to and remain the sole property of Company at all times."

(c) Assistance. I will promptly disclose to Company all Inventions and will assist Company in obtaining and enforcing for its own benefit, patents, copyrights and/or trademarks on those Inventions in any country throughout the world. Upon request, I will sign all documents and papers necessary to perfect the assignment and recordation of assignment of all those Inventions to Company.

(d) Access. Because of the difficulty of establishing when any Inventions are first conceived by me, or whether they result from my access to Confidential Information, I agree that any Invention shall, among other circumstances, be deemed to have resulted from my access to materials, including, without limitation, Confidential Information of Company if: (i) it arose from or resulted from my work for Company or is related to Company business and (ii) it is made, used, sold, exploited or reduced to practice, or an application for patent" trademark, copyright or other proprietary protection is filed thereon, by me, with my assistance, or identifying me as an inventor or co-inventor, while I am a Company employee or within one (1) year after termination of my employment by Company.

(e) Termination Obligation. I acknowledge and agree that my obligations under this Section 2 will continue after the termination of my employment with Company and that I will perform such obligations without further consideration, except for reimbursement of expenses incurred at the request of Company. In addition, I understand that the absence of a request by Company for information, or for the making of an oath or declaration, or for the execution of any document, shall in no way be construed to constitute a waiver of any of Company' rights or interests under this Agreement.

**FILED UNDER SEAL**

Exhibit B, ¶2.

125.    Conyers breached his obligations under the Agreement by, *inter alia*, failing to maintain written records of all such Inventions and make them available to Apollo at all times, and failing to return Apollo's confidential information and return it upon termination of his employment.

126.    The Agreement expressly provides that Apollo is entitled to injunctive relief in such circumstances, as well as attorneys' fees and costs:

> 6. Injunction.
>
> I agree that the breach or threatened or attempted breach of any provision of Sections 1,2, 3 or 4 of this Agreement will cause irreparable harm to Company for which any remedies at law would be inadequate. Accordingly, in the event of my breach or threatened or attempted breach of any such provision, I agree that Company, in addition to and not to the exclusion of any other rights and remedies at law or in equity, shall be entitled to (i) full temporary and permanent injunctive relief enjoining and restraining me and each and every other person, firm, organization, association, partnership, corporation or entity concerned therewith from the continuation of such violative acts and (ii) a decree for specific performance of the provisions of this Agreement, without being required to show actual damage or irreparable harm, or to furnish any bond or other security. Further, I will not plead in defense thereto that there would be an adequate remedy at law. I further agree that if I am found in violation of any provision of Sections 1,2, 3 or 4 of this Agreement in any legal proceeding brought by Company, I will pay to Company all costs and expenses (including without limitation) court costs and reasonable attorneys' fees) incurred by Company in enforcing its rights hereunder.

*See* Exhibit B, ¶ 6.

127.    As a direct and proximate result of Conyers' breaches of the Agreement, Apollo is suffering and will continue to suffer irreparable injury -- namely, the loss of control of its highly

**FILED UNDER SEAL**

confidential proprietary trade secrets -- for which a remedy at law is inadequate, as Conyers acknowledged in the Agreement. Accordingly, Apollo is entitled to injunctive and equitable relief.

128.    In addition, as a consequence of Conyers' breaches of the Agreement, Apollo seeks actual, compensatory, consequential, and incidental damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

FILED UNDER SEAL

## SECOND CAUSE OF ACTION
### Misappropriation of Trade Secrets, 18 U.S.C. §1832 *et seq.*

129.    Apollo incorporates the allegations in the preceding paragraphs of this Complaint as if fully set forth below.

130.    By virtue of his employment with Apollo, Conyers was given access to and possessed trade secrets and confidential information of Apollo, as more fully and particularly described above.

131.    Such information was developed and maintained by Apollo at great time, cost and expense to Apollo, and is maintained in confidence by Apollo.

132.    Apollo derives substantial independent economic value from the trade secrets and confidential information entrusted to Conyers.

133.    Such information is not generally known or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use.

134.    Such information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

135.    Such information is considered a trade secret at common law and under the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 *et seq.*, because Apollo derives independent economic value from this information, which is not generally known to the public, not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839.

136.    Conyers is using and disclosing Apollo's trade secrets by improper means and without authorization.

FILED UNDER SEAL

137.    Conyers knew or should have known that the information, as described, (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Apollo at great expense and effort; (4) was maintained as confidential and is not generally available to the public or to Apollo's competitors; (5) would provide significant benefit to a competitor seeking to compete with Apollo; and (6) is critical to Apollo's ability to conduct its business successfully.

138.    Conyers actually misappropriated and threatens to continue misappropriating Apollo's trade secrets and confidential information without Apollo's consent.

139.    Conyers has been and will be unjustly enriched by the misappropriation and threatened continuing misappropriation of Apollo's trade secrets and confidential information. Unless restrained, Conyers will continue to use, divulge, inevitably disclose, and/or otherwise misappropriate Apollo's trade secrets and confidential information.

140.    Conyers' actual and/or threatened misappropriation has been willful and malicious.

141.    As a consequence of Conyers' actual and threatened continuing misappropriation of Apollo's trade secrets and confidential information, Apollo has been harmed and faces additional irreparable injury. Unless Conyers is enjoined and restrained by order of the Court, Apollo is threatened with losses -- resulting from its inability to control the use of its trade secrets -- for which there is no adequate remedy at law.

142.    In addition, as a consequence of Conyers' misappropriation of Apollo's trade secrets, Apollo seeks actual, compensatory, consequential, and incidental damages and costs in an amount to be determined at trial.

**FILED UNDER SEAL**

      **WHEREFORE,** Plaintiff, Apollo Enterprise Imaging Corp., respectfully requests that the Court enter Judgment in its favor and an Order against Conyers granting the following relief:

1.     An *ex parte* Order pursuant to 18 U.S.C. § 1836(b)(2)(A) directing the seizure of the following devices, and any other devices with respect to which it is readily apparent during seizure that they also contain Apollo's information:

| Device Name | Identifier |
|---|---|
| Western Digital My Passport | SN: 575845314132315334383833 |
| Seagate Backup Slim | SN: NA9MA3MV |
| Dell Portable Disk | SN: NA53Z080 |
| Kingston DT 101 G2 | SN:001cc0c60e20cbb1242923c9 |
| Western Digital My Passport 0740 | SN: 575844314539314c59544a35 |
| Kingston DataTraveler 2.0 | SN: 1c6f6581fdf7ed91d90e00c0 |
| WD My Passport 07A8 | SN: 575843314139323438333939 |
| Generic External Drive | SN: d56b1ac1 |
| Generic External Drive | SN: 47349433 |
| Generic External Drive | SN: 7ce4032e |
| Generic External Drive | SN: 0064e1f6 |
| Generic External Drive | Volume Serial: da95-4ec4 |

2.     A preliminary and permanent injunction:

    (a)     Directing Conyers to identify any and all other locations in his possession or control where Apollo's information is stored;

    (b)     Enjoining Conyers from violating the Confidentiality and Inventions Agreement he entered into with Apollo;

    (c)     Enjoining Conyers, and all parties in active concert or participation with him, from accessing, using or disclosing any of Apollo's confidential, proprietary and trade secret information;

    (d)     Enjoining Conyers, and all parties in active concert or participation with him, for a period of one (1) year following entry of judgment against them, from directly or indirectly soliciting the business of any of Apollo's clients and prospective clients, to be identified by Apollo with particularity;

    (e)     Enjoining Conyers, and all parties in active concert or participation

FILED UNDER SEAL

with him, for a period of one (1) year following entry of judgment against them, from persuading any of Apollo's clients to cease doing business with Apollo and/or persuading any of Apollo's clients to conduct business with another business competitive with Apollo;

(f)   Ordering Conyers, and all parties in active concert or participation with them, to return to Plaintiffs all originals and copies of all files, devices, electronically stored information, and/or documents that contain or relate to Apollo's confidential, proprietary and trade secret information;

3.    An award of:

(a)   Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial;

(b)   Punitive damages in an amount to be proven at trial due to Conyers' willful and malicious conduct;

(c)   Costs and expenses incurred herein, including reasonable attorneys' fees and interest; and,

Such other relief as the Court may deem just, equitable and proper.

December 19, 2019

Respectfully Submitted,

POTOMAC LAW GROUP, PLLC

By: _____
Janet F. Satterthwaite (VSB No. 26759)
jsatterthwaite@potomaclaw.com
(202) 486-1578
Susan V. Metcalfe (*pro hac pending*)
smetcalfe@potomaclaw.com
(717) 951-5653
Elissa Brockbank Reese (VSB No. 78969)
ereese@potomaclaw.com
(804) 840-4686
POTOMAC LAW GROUP, PLLC
1300 Pennsylvania Avenue, Suite 700
Washington, DC 20004
Telephone: 202.838.3173
Facsimile: 202.318.7707

*Attorneys for Plaintiff*
APOLLO ENTERPRISE IMAGING CORP.

36

# Exhibit A



7700 Leesburg Pike, Suite 419
Falls Church, Virginia 22043
(703) 288-1474   Fax (703) 288-1479
www.Apolloei.com

July 21, 2017

James Michael Conyers

Wellington, CO ▮▮▮▮

Dear Jim:

I am pleased to offer you the Apollo position of:  Chief Product Officer (CPO)

**JOB DESCRIPTION**
Please see Exhibit A

The principal terms of the offer are:

**START DATE**
August 1, 2017.

**COMPENSATION**
Base annual salary of $160,000.00 paid semi-monthly, subject to tax withholding and other standard deductions.
Bonus of up to 10% of annual salary with benchmarks to be mutually agreed upon.

**BENEFITS**
Health – Apollo's standard health benefits will be available to you once you have been with the company for three months.  During your three month probation period beginning August 1, 2017, Apollo will reimburse you for your COBRA payments on your current insurance.

Retirement – There is currently no retirement plan in place.  Apollo is exploring implementing this plan.  Your eligibility will be determined per the plan when one is established by the company.

Leave Policy – You will have twelve days of vacation in 2017. For calendar year 2018, you will be treated as a second year employee and all other aspects of the Apollo corporate leave policy apply.  Holidays are provided above vacation time. The list of dates will be provided annually.

## STOCK OPTIONS
If you are an employee in good standing on July 31, 2018, you will be awarded options enabling you to purchase 250,000 shares of Apollo common stock.

These options will have an exercise price of $0.50/share and will be subject to the terms, conditions and restrictions of Apollo's Stock Option Plan.

## TRAVEL EXPENSES
Any travel which may be required will be reimbursed by the company. All travel is pre-approved by the CEO or his/her designated staff. This will include reasonable travel between Wellington, Colorado and Falls Church, Virginia.

## BASE OF OPERATIONS
Your official base of operations will be at Apollo's offices which are located at 7700 Leesburg Pike, Suite 419, Falls Church, Virginia. However, you will not be required to move your residence as your position can be conducted for the most part remotely from your base of operations. Apollo will provide you with the ability to operate out of your home remotely for workdays in which you operate from your home. . Apollo reserves the right to move the office at any-time and require you to change your base of operations in order to continue employment.

## EQUIPMENT AND RELATED SOFTWARE
Apollo uses Salesforce and Office 365. You will be provided subscriptions for each. At training, you will be provided with a Windows based device (computer/tablet) to support your corporate activities. Apollo will either provide you with a Smart phone (currently AT&T) or we will reimburse you in arrears for your existing service.

## CONFIDENTIALITY
As an Apollo employee, you may be exposed to information considered confidential by the organization. All information will be considered confidential unless I indicate otherwise. Once you accept this offer, I will provide you with the appropriate agreements relating to confidentiality for your signature.

## WORK AUTHORIZATION
You hereby represent that you are a U.S. citizen legally authorized to work in the United States without visa sponsorship. This offer of employment is conditioned upon the successful completion of a background investigation and/or drug screen if one is requested by Apollo.

## EMPLOYMENT AT WILL
Virginia is an employment-at-will state; this means Apollo may terminate any employee at any time, for any reason, or for no reason. As a general rule, therefore, the employee has no right to challenge the termination.

Apollo is poised for growth. You have the skill set Apollo is seeking to help achieve this growth. I look forward to working with you.

Sincerely,

*Mark Newburger*

Mark J. Newburger
President & CEO

Please sign below to show acceptance and agreement of the above terms:

_____          _____
James Michael Conyers                        Date  7/24/17

# Exhibit B

## CONFIDENTIALITY AND INVENTIONS AGREEMENT

### James Michael Conyers

In consideration of my employment or continued employment as an employee of Apollo Enterprise Imaging Corp, ("Company"), and the compensation to be paid me by Company during my employment, I hereby agree as follows:

1.      Confidentiality.

    (a)  Company Competence.  I acknowledge and agree that Company's ongoing operations are the direct result of Company's special competence in its field of endeavor, and that such ongoing operations depend directly on Company's ownership and possession of confidential and proprietary information, not generally known to others, including specialized information about research, development, production, marketing and management in Company's field of endeavor (collectively, "Confidential Information" as further defined below).

    (b)  Protection of Confidential Information.  I acknowledge that in the course of my employment, I will have access to and gain possession of Confidential Information owned by and proprietary to Company.  Accordingly, I agree as follows:

    (i)  I will at all times take reasonable steps to protect the confidential and proprietary nature of Confidential Information, and prevent inadvertent or unauthorized disclosure of the same; and

    (ii)  I will not use or copy any Confidential Information for any purpose or disclose Confidential Information to any person or entity (A) during my employment, except as expressly authorized by and for the benefit of Company and in the course of my duties as an employee of Company, and (B) at any time or for any reason after my employment ends; and

    (iii)  All Confidential Information is, and will remain, at all times the exclusive property of Company.  All Confidential Information in my possession will be held by me for Company's benefit and enjoyment.  If and when my employment by Company is terminated for any reason, or upon the request of Company, I will promptly return all Confidential Information in my possession to Company.

    (c)  Definition.  "Confidential Information" means any confidential or proprietary information owned or controlled by Company, including, without limitation, software (source and object code), programming, data, data structures, algorithms, computer processing, techniques, methodologies, formulae, processes, flow charts and diagrams, drawings, proposals, notes, memorandums, computer disks, reports, records, research, specifications, compilations or repositories of information, inventions, ideas, discoveries, improvements, products, plans, concepts and system designs, all information concerning the business of Company and any of its clients, including without limitation, lists of Company' clients and customers, marketing and sales plans, licenses granted or received, financial information, fees and/or costs and/or prices applicable to any deliverable work product of Company, and any other material concerning or reasonably related to the business, research or development of Company and Company' good will.  Any of the foregoing may be published or unpublished, in electronic or hard copy, and in any format now known or hereafter invented.

2.      Inventions

    (a)(1)  Company Ownership.  Any and all inventions, original works of authorship, developments, concepts, improvements, trade secrets, ideas, processes, procedures, systems, discoveries, designs, configurations, computer data, software, firmware, microcode, or technology, (whether or not patentable, copyrightable and/or trademarkable), whether or not made, conceived or reduced to practice during working hours or using Company' equipment, computers, data or facilities (collectively, "Inventions"), which I have made, conceived, invented, discovered, reduced to practice, or acquired during my employment, or which I make, conceive, invent, discover, reduce to practice, or acquire subsequently during my employment by Company, either alone or with others with others, and which are related to Company's present or planned business, shall be solely owned by Company.  If, and to the extent, applicable, such Inventions will be deemed to be "works-made-for-hire."

(a)(2) <u>Assignment of Inventions</u>.  I agree to assign, and hereby do assign, to Company all rights, title and interest in and to any Inventions, whether or not patentable or registrable under patent, copyright, or similar laws relating to intellectual property rights, which I, alone or with others, may conceive, develop or reduce to practice (constructively or otherwise) during my past or future employment with Company or its predecessors or successors in interest, including the right to sue for past damages.  If I incorporate in a Company product, process, computer program, computer program product, or machine, a prior invention owned by me or in which I have an interest, Company is hereby granted a non-exclusive, royalty-free, irrevocable, perpetual, world-wide license to make, have made, modify, reproduce, distribute, use, import, license, sell, and offer to sell any such prior invention as part of, or in conjunction with such product, process, computer program, computer program product, or machine.

(b)  <u>Maintenance of Records.</u>  I agree to keep and maintain adequate and current written records of all such Inventions (in the form of notes, sketches, drawings, charts and as may be specified by Company), which records shall be available to and remain the sole property of Company at all times.

(c)  <u>Assistance.</u>  I will promptly disclose to Company all Inventions and will assist Company in obtaining and enforcing for its own benefit, patents, copyrights and/or trademarks on those Inventions in any country throughout the world.  Upon request, I will sign all documents and papers necessary to perfect the assignment and recordation of assignment of all those Inventions to Company.

(d)  <u>Access.</u>  Because of the difficulty of establishing when any Inventions are first conceived by me, or whether they result from my access to Confidential Information, I agree that any Invention shall, among other circumstances, be deemed to have resulted from my access to materials, including, without limitation, Confidential Information of Company if: (i) it arose from or resulted from my work for Company or is related to Company's business and (ii) it is made, used, sold, exploited or reduced to practice, or an application for patent, trademark, copyright or other proprietary protection is filed thereon, by me, with my assistance, or identifying me as an inventor or co-inventor, while I am a Company employee or within one (1) year after termination of my employment by Company.

(e)  <u>Termination Obligation.</u>  I acknowledge and agree that my obligations under this Section 2 will continue after the termination of my employment with Company and that I will perform such obligations without further consideration, except for reimbursement of expenses incurred at the request of Company.  In addition, I understand that the absence of a request by Company for information, or for the making of an oath or declaration, or for the execution of any document, shall in no way be construed to constitute a waiver of any of Company' rights or interests under this Agreement.

3.      <u>Absence of Restrictions Upon Disclosure For New Employees.</u>

As a new employee, I hereby represent that, except as disclosed in writing to Company in the Disclosure Document appended hereto as Exhibit A, I am not bound by the terms of any agreement with any previous employer or other party to refrain from using or disclosing any trade secret or confidential or proprietary information of the aforementioned previous employers or other parties in the course of my employment with Company.  I further represent that my performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge of data acquired by me in confidence or in trust prior to my employment with Company, and I will not disclose to Company or induce Company to use any confidential or proprietary information or material belonging to any previous employer or others.

4.      <u>Non- Solicitation.</u>

During the period while I am employed hereunder and for a period of one (1) year following the termination of my employment hereunder for any reason I will not, without the prior written consent of Company:

(a)      Either individually or on behalf of or through any third party, solicit, divert or appropriate or attempt to solicit, divert or appropriate, any joint venture or collaborative research partners, customers or patrons of the Company, or any prospective customers or patrons with respect to which the Company has developed or made a presentation for the use or exploitation of products or processes in the Field of Interest (or similar offering of services); or

(b)      Either individually or on behalf of or through any third party (A) hire any person who is or has been in the six (6) months prior to such activity employed or otherwise engaged by the Company, (B) solicit, entice or persuade or attempt to solicit, entice or persuade any person who is or has been in the six (6) months prior to such activity employed or otherwise engaged by the Company to leave the service of the Company or (C) solicit, entice or persuade or attempt to solicit, entice or persuade any person who is or has been in the six (6) months prior to such activity employed or otherwise engaged by the Company to become employed or otherwise engaged by me or any entity other than the Company.

5.      <u>Reasonableness</u>.

        Company and I agree that Company performs, sells or solicits for the sale of its services and/or products throughout North America and further agree that the provisions of this Agreement relative to duration, scope and/or geographic area are reasonable and will not prevent me from earning a livelihood if they are enforced.  If any court of competent jurisdiction should determine that the duration, scope or geographic area set forth in any provision of this Agreement exceeds the maximum duration, scope or geographic area which said court deems reasonable and enforceable, it is the intention of the parties that such provision not be deemed invalid and unenforceable, but rather that the duration, scope or geographic area shall be deemed to be those which the court deems the maximum enforceable restrictions, but only with respect to the operation of this Agreement in the jurisdiction of the court that has made such adjudication.

6.      <u>Injunction</u>.

        I agree that the breach or threatened or attempted breach of any provision of Sections 1, 2, 3 or 4 of this Agreement will cause irreparable harm to Company for which any remedies at law would be inadequate.  Accordingly, in the event of my breach or threatened or attempted breach of any such provision, I agree that Company, in addition to and not to the exclusion of any other rights and remedies at law or in equity, shall be entitled to (i) full temporary and permanent injunctive relief enjoining and restraining me and each and every other person, firm, organization, association, partnership, corporation or entity concerned therewith from the continuation of such violative acts and (ii) a decree for specific performance of the provisions of this Agreement, without being required to show actual damage or irreparable harm, or to furnish any bond or other security.  Further, I will not plead in defense thereto that there would be an adequate remedy at law.  I further agree that if I am found in violation of any provision of Sections 1, 2, 3 or 4 of this Agreement in any legal proceeding brought by Company, I will pay to Company all costs and expenses (including, without limitation, court costs and reasonable attorneys' fees) incurred by Company in enforcing its rights hereunder.

7.      <u>Miscellaneous</u>.

        (a)      <u>Nature of Relationship.</u>  This Agreement is not an Employment Agreement.  Company and I expressly acknowledge and agree that nothing in this Agreement either expressly or impliedly creates, or will be deemed to create, continue or guarantee any terms of employment or engagement by Company.

        (b)      <u>Governing Law; Jurisdiction; Venue.</u>  The provisions of this Agreement shall be governed by the laws of the Commonwealth of Virginia.  In any action, proceeding or appeal on any matter relating to or arising out of this Agreement, I agree that (i) I shall be subject to the personal jurisdiction of the Commonwealth of Virginia, including any state or federal court sitting therein, and all court rules thereof, (ii) venue shall be proper in any state or federal court in the Commonwealth of Virginia, and (iii) I hereby expressly waive any right to a trial by jury in any such action or proceeding.

        (c)      <u>Severability.</u>  Subject to Section 5 above, should any portion or provision of this Agreement for any reason be declared or held invalid or unenforceable, such invalidity or unenforceability shall attach only to such portion or provision and shall not affect the validity or enforceability of any other portion or provision of this Agreement.

        (d)      <u>Assignment; Integration.</u>  This Agreement is personal to me and my duties and obligations hereunder may not be assigned by me to any Entity without the prior written consent of Company.  This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by me and Company.  I agree that any subsequent change in my duties, salary or compensation shall not affect the validity or scope of this Agreement.  This Agreement supersedes all prior agreements, written or oral between me and Company relating to the subject matter of this Agreement.

(e) Nonwaiver. No delay or omission by Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

(f) Writings. As used in the Agreement, reference to a writing, or being in a written form, includes electronic versions of the same content, where such electronic versions legally acceptable.

IN WITNESS WHEREOF, Company, by its duly authorized representative, and James Michael Conyers have executed this Agreement as of the dates set forth below.

**James Michael Conyers:**                    Apollo Enterprise Imaging Corp:

By:                                           By: *Mark Newburger*

Name:    James Michael Conyers               Name: Mark J Newburger
Date                                          Title: President & CEO
                                              Date:

Page 4

# Exhibit C

From: James Conyers <james.conyers1975@gmail.com>
Sent: Thursday, October 17, 2019 3:27 PM
To: Mark J. Newburger <mnewburger@apolloei.com>
Subject: Resignation

James Conyers
████████████
Wellington, CO ████
(970) 821-5463
James.Conyers1975@gmail.com

10/17/2019

Apollo Enterprise Imaging Corp
8245 Boone Blvd., Suite 620
Tysons, VA 22182

Dear Mr. Newburger:

I would like to inform you that I am resigning from my position as Chief Product Officer for the Apollo Enterprise Imaging Corp, effective immediately.

Thank you for the opportunities that have been provided to me during the last two years. I have enjoyed my time with Apollo and its employees.

Thank you for your support. Please let me know when I can collect my personal Items from the Fort Collins office, including the pictures on the wall that has my initials on the back.

Sincerely,


James Conyers

# Exhibit D

| | |
|---|---|
| **From:** | Catherine Guttman-McCabe |
| **To:** | James Convers |
| **Subject:** | Re: Exist Strategy Proposal |
| **Date:** | Monday, October 21, 2019 6:13:56 PM |

Thank you for your email. You are required to turn over any and all work product and data, files, documents, information, designs, code, etc. pertaining to Apollo and its business during the entire duration of your employment. Once you have done so, please give us written confirmation that you have given us everything.

Thanks,

**Catherine R. Guttman-McCabe** | Partner | Potomac Law Group, PLLC
1300 Pennsylvania Avenue, NW, Suite 700
Washington, D.C. 20004
Telephone: (202) 262-7083 | Fax: (202) 318-7707
cguttman-mccabe@potomaclaw.com | www.potomaclaw.com

This e-mail and any attachments may contain information that is private, confidential, and/or privileged. If you are not the intended recipient, please notify us immediately and destroy all copies of this message and any attachments.

**From:** James Conyers <james.conyers1975@gmail.com>
**Date:** Monday, October 21, 2019 at 5:33 PM
**To:** "cguttman-mccabe@potomaclaw.com" <cguttman-mccabe@potomaclaw.com>
**Subject:** Re: Exist Strategy Proposal

## EXTERNAL

Catherine,
Hope your weekend was well. My statement in the document/email to Mark was that the situation has caused me to seek legal counsel and retain an attorney. I never once said otherwise or that, that process was fully completed. Further I shared with Mark and Mr. McGrath that I would be meeting with the law firm again this week and once that was done I would then be in touch. During that time you reached and in yoru email said you would communicate with me until otherwise noted. I then in an attempt to yet again try to resolve this matter and put it behind Apollo and me, communicated with you to speak to me until I heard back from Sara. I was hoping to resolve without having to continue to escalate the matter. All I needed to know was what is being asked of me to provide so that i can and be done with this situation. As for the proposed exist package I no longer have a need or desire for the exist package or proposal.

You have the choice to discuss with me or not, or wait to here from me after my next meeting with the law firm. If the later is your choice I will then be in touch with you on Weds this week. I hope that this is acceptable. If you wish to provide me a list of what I need to provide to bring this matter to a

close please do so, and I WILL HAPPILY provide you with whatever it is or a response as why I cannot provide.

Thank you for your time,

Jim Conyers

On Mon, Oct 21, 2019 at 2:33 PM Catherine Guttman-McCabe <cguttman-mccabe@potomaclaw.com> wrote:

> Good afternoon.  As a matter of professional ethics, a lawyer should not communicate with a person the lawyer knows to be represented by counsel, unless the lawyer has the consent of such counsel.  Since you have informed me that you are represented by a lawyer – but I only know the person's first name – I am again requesting that you provide me with the contact information for your attorney or provide her with my contact information by close of business tomorrow.
>
> Thanks,
>
> **Catherine R. Guttman-McCabe** | Partner | Potomac Law Group, PLLC
> 1300 Pennsylvania Avenue, NW, Suite 700
> Washington, D.C. 20004
> Telephone: (202) 262-7083 | Fax: (202) 318-7707
> cguttman-mccabe@potomaclaw.com | www.potomaclaw.com
>
> _____
>
> This e-mail and any attachments may contain information that is private, confidential, and/or privileged. If you are not the intended recipient, please notify us immediately and destroy all copies of this message and any attachments.

**From:** James Conyers <james.conyers1975@gmail.com>
**Date:** Friday, October 18, 2019 at 11:18 AM
**To:** "cguttman-mccabe@potomaclaw.com" <cguttman-mccabe@potomaclaw.com>
**Subject:** Re: FW: Exist Strategy Proposal

## EXTERNAL

Dear Catherine,

Thank you for reaching out. I would like to first begin by saying I am not demanding anything as you suggested in your email. I provided a proposal only in hopes of coming to a positive conclusion to our business relationship. I apologies if it was interpreted any other way. I was also

clear that Apollo has no obligation in anyway and we can simple cut ties and move on.  Next, I have no issue in providing any proprietary information in my possession, although I am not sure what information is being referenced. In order for me to comply Apollo has to provide what they believe is in my possession,  I want to make sure I am not making assumptions and that I understand completely. If a clear explanation of what is believed to be in my possession and what proprietary information I have I am more then happy to provide at the time that we have an agreed and signed exist solution matter whatever the final details of that is. Of which i am happy to discuss with you as well. If you have the details to this and believe it would be better to discuss over the phone rather then email I am happy to do so. Until I am able to speak to Sara today please continue to speak to me.

All I want is to get this done and put Apollo as far behind me as possible.

Sincerely,
Jim


On Fri, Oct 18, 2019 at 8:07 AM Catherine Guttman-McCabe <cguttman-mccabe@potomaclaw.com> wrote:

Mr. Conyers,

I represent Apollo Enterprise Imaging Corp. (the "Company"), and I am in receipt of your email below.  Please provide me with contact information for your attorney so that I may communicate with him or her directly regarding your proposal and a potential resolution of this matter.  Until I receive contact information for your attorney, I will continue to communicate with you directly, as necessary.

It is also very important that I discuss with your attorney your continuing obligations under your Confidentiality and Inventions Agreement.  You are contractually bound to protect the Company's confidential and proprietary information, which remains the exclusive property of the Company.  I understand that your resignation occurred while there were unanswered requests from the Company for proprietary information in your possession.  You must return any Company property and confidential information and are prohibited from destroying it or using it for any unauthorized purpose.  In addition, in light of the dispute you have raised and your demand for severance to which you are not otherwise entitled, you have a duty to preserve evidence until this matter is resolved.

**Catherine R. Guttman-McCabe** | Partner | Potomac Law Group, PLLC
1300 Pennsylvania Avenue, NW, Suite 700
Washington, D.C. 20004
Telephone: (202) 262-7083 | Fax: (202) 318-7707
cguttman-mccabe@potomaclaw.com | www.potomaclaw.com

---

This e-mail and any attachments may contain information that is private, confidential, and/or privileged. If you are not the intended recipient, please notify us immediately and destroy all copies of this message and any attachments.

**From:** James Conyers <james.conyers1975@gmail.com>
**Sent:** Thursday, October 17, 2019 3:28 PM
**To:** Mark J. Newburger <mnewburger@apolloei.com>
**Subject:** Exist Strategy Proposal

Dear Mark,

I hope this finds you doing well. I'm writing regarding the most recent events dealing with me being placed on paid administrative leave. Since this time several events have occurred that have placed me in an uncomfortable situation. In the meeting held in the Fort Collins office on 10/2/2019 I was put on paid administrative leave, in attendance was Kevin Stinson a member of the executive leadership team and Executive VP of Sales. It was agreed and understood that Apollo and its leadership team would merely communicate that I was on leave. It was brought to my attention last week, when a concerned employee reached out because of a conversation that was had with them by Kevin Stinson. It seems that Mr. Stinson has had several conversations with various employees. Kevin has violated that agreement, my rights and trust. He has placed me in an uncomfortable and unsafe situation. Next, Mark the trust that I had for you is almost completely gone. This has been hard on me. I have been your biggest supporter and defender. You can ask anyone I ever interviewed, when they asked about the CEO, I would say every time, he is probably one of the most amazing human beings I have met, kind, caring, family focused and a man of his beliefs. Since you placed me on paid administrative leave your communication and stance are portraying that you are taking the position that you had no idea of the ███████ issues, my concerns, etc. Knowing that this is false and that I have for a very long time expressed over and over again my concerns, this perception has left me questioning your trust worthiness. This has led me to seek and retain my own legal representation. After deep consideration I have realized that Apollo is a company I cannot continue to work for. This brings great sadness to me. I have always and will always hope that Apollo will be successful and continue what we started. I also hope that you will make the right choices ███████████████. The man I met 2 year ago is still here and I understand how stressful financial situations can be and the affect it has on our choices. I know deep down you will do the right thing and will come out an even better human being and extremely successful for it.

Mark, I have no desire, nor do I want to do anything to affect Apollo's success. There are many great people at Apollo and the product and direction is the right one. I have been advised to propose an exit strategy to provide a positive outcome before having to put others and customers in an uncomfortable and unsuccessful situation. I have provided a link to some materials for your review. Because of what happen back in June, I have been walking on eggshells. I have taken measures to protect myself from this exact situation of he said she said.

Mark, I sent you that email and you alone. I could have taken so many different paths, but my intention was only to protect Apollo, as it always has been. I have done my duty and provided you for a long time now ██████████████████████. At this point, I have nothing further to do in regard to this matter and as you move forward it is up to you and your ELT as to what you do ████. I want nothing else to do with any of it, I did my job and my duties, what happens next ███████████ is out of my abilities. Therefore, I have attached the following exist strategy proposal. It was put together to be simple and easy to read and understand. I asked for it to be that way. In a nutshell it is this at a high level:

1.  I will never say anything bad about Apollo and Apollo (and Apollo Employees) will not say anything bad about me.

2.  I will not file ██████████████ ██████████████ social media post or anything that would present negatively for/about Apollo.

3.  I will maintain that I am resigning for personal reasons and that Apollo has been very supportive.

4.  I will continue to support Apollos relationship with ███████ and ███████████, and I am willing to work with Kevin to set the stage for ███████ over the next week, so that it can move forward positively and be successful. I will ensure that ███████████ ) knows that he is doing the right thing with the Apollo Enterprise viewer and encourage him to continue to move forward.

5.  I will not go after any Apollo Employee or discuss any details of this situation or anything that has led up to it with employees or customers.

6.  I will not go after or engage with any currently active opportunity in which Apollo has an active and current: POC, RFP or contracting in process. I will in any way possible support positively the ███████ opportunity, and as such not having any interaction with them while this current RFP is in process. The same for ███ .

7.  I will not reach out or communicate anything to ███████ about the situation and if they reach out to me merely communicate the same, had to move on for personal reasons and that Apollo was very supportive and I wish them well.

8.  Apollo will provide me a 3-month severance package with healthcare. Starting Nov 1, 2019 through Feb 1 2020.

9.  Apollo will pay as scheduled my October 22, 2019 pay as normal including deductions as normal.

10. Apollo will deduct from section 8 my employee contribution to healthcare from the lump sum that is to be deposited into my account on the next pay day oct 22, 2019. Apollo will not take out any other deductions other than employee contribution for healthcare. All taxes and Child support payments will be handled by me.

This exist Strategy is Valid through start of Business oct 22, 2019 8 AM MST. It must be signed and executed prior to that date and time. If my regular schedule pay and/or the 3month severance is not in my account by COB Oct 22, 2019 the agreement is null and void.

Mark, I want to move on with my life and get as far away from Apollo as I possibly can. I want to take some time to figure out what is next and have time to find a new career and to take care of my baby girl and my family. I wish you all the success in the world Mark, I really do, try not to lose yourself along the way. And if our paths cross again in the future, I hope it is with kindness and respect. I will be around all weekend. I will not be meeting with Mr. McGrath at this time. I will be meeting with my attorney again on Oct 23, 2019 to discuss Mr. McGrath's request and this situation. Until that is complete, I will not be engaging any further with Apollo on these matters. I hope this is all a moot point and that we have come to a positive conclusion to our business relationship. If you have any questions, please reach out via email. If Apollo has no desire to work out a positive exist strategy, I respect that, and we can discuss next steps. I am asking you to rein Mr.

Stinson in and have him cease and desist all communications related to me and stop all continued defamation of my character internally and externally to Apollo.

Thank you for everything Mark, I wish you and your family all the wonders life has to offer. Take care.

Sincerely,


Jim Conyers

10/17/2019

 materials

https://drive.google.com/drive/folders/1WSB375XZkxMtbKVa88Hwh5HTTAX0x-3f?usp=sharing

# Exhibit E

| From: | Mark J. Newburger |
|---|---|
| To: | James Convers |
| Cc: | Catherine Guttman-McCabe |
| Subject: | RE: Resignation |
| Date: | Friday, October 18, 2019 10:01:35 AM |
| Attachments: | image001.png |
| | image004.png |
| | Cn Doc v2 full.pdf |

⚠ **EXTERNAL**

Jim:

I accept your resignation from Apollo effective October 17, 2019. I understand you are working with Lisa on the transfer of the website data and I expect that will occur expeditiously. Lisa will also communicate with you about exit procedures.

I am attaching a copy of your Confidentiality and Inventions Agreement under which you have continuing obligations related to protection of Company confidential information and Company property.

With respect to the matters addressed in your email related to "Exit Strategy Proposal," I have forwarded that email to our lawyer, Catherine Guttman-McCabe, who is copied here and whose contact information is below.

**Catherine R. Guttman-McCabe** | Partner | Potomac Law Group, PLLC
1300 Pennsylvania Avenue, NW, Suite 700
Washington, D.C. 20004
Telephone: (202) 262-7083 | Fax: (202) 318-7707
cguttman-mccabe@potomaclaw.com | www.potomaclaw.com

Sincerely,

Mark J. Newburger
President & CEO
Apollo Enterprise Imaging Corp
(o) 703.288.1474 x102

Visit us at RSNA Dec. 1-5 in Booth 8113



Apollo



******************* Internet Email Confidentiality *******************
The information contained in this message (including any attachments) may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that it is strictly prohibited (a) to disseminate, distribute or copy this communication or any of the information contained in it, or (b) to take any action based on the information in it. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

**From:** James Conyers <james.conyers1975@gmail.com>
**Sent:** Thursday, October 17, 2019 3:27 PM
**To:** Mark J. Newburger <mnewburger@apolloei.com>
**Subject:** Resignation

James Conyers

██████████
Wellington, CO ███████
(970) 821-5463
James.Conyers1975@gmail.com

10/17/2019

Apollo Enterprise Imaging Corp
8245 Boone Blvd., Suite 620
Tysons, VA 22182

Dear Mr. Newburger:

I would like to inform you that I am resigning from my position as Chief Product Officer for the Apollo Enterprise Imaging Corp, effective immediately.

Thank you for the opportunities that have been provided to me during the last two years. I have enjoyed my time with Apollo and its employees.

Thank you for your support. Please let me know when I can collect my personal Items from the Fort Collins office, including the pictures on the wall that has my initials on the back.

Sincerely,


James Conyers

# Exhibit F

**From:** James Conyers <james.conyers1975@gmail.com>
**Date:** October 22, 2019 at 10:06:01 PM EDT
**To:** Catherine Guttman-McCabe <cguttman-mccabe@potomaclaw.com>
**Subject: Re:  Exist Strategy Proposal**

⚠ **EXTERNAL**

Dear Catherine,

I hope you are well. I have attached the confirmation document to this email. I will be sending the thumb drive to Apollo Enterprise Imaging HQ Tomorrow Morning. I will then forward the tracking and details for the package. The thumb drive contains the requested information. Please let me know if you have any questions.

Thanks in advance
Jim Conyers

On Mon, Oct 21, 2019 at 4:13 PM Catherine Guttman-McCabe <cguttman-mccabe@potomaclaw.com> wrote:

> Thank you for your email.  You are required to turn over any and all work product and data, files, documents, information, designs, code, etc. pertaining to Apollo and its business during the entire duration of your employment.  Once you have done so, please give us written confirmation that you have given us everything.

10/22/2019

To Whom it may concern:

The following is in the provided flash drive. This confirms that I have returned everything that was requested.

Sincerely,

*James Conyers*

Jim Conyers

**NSM 2019 Pictures: (JPG )**

| | | |
|---|---|---|
| Dsc_0247 | Dsc_0252 | Dsc_0256 |
| Dsc_0248 | Dsc_0253 | Dsc_0257 |
| Dsc_0249 | Dsc_0254 | Dsc_0258 |
| Dsc_0251 | Dsc_0255 | |

**Press Releases: (word Docs)**

██████████████

██████

**Other:**

| | | |
|---|---|---|
| ████████ (Word) | Testrail-report-16 (PDF) | ████████ (MP4) |
| 2019-10-02_09-41-28 (png) | Testrail-report-17 (PDF) | ████████ (1) (MP4) |
| IM Kevin 1 (JPG) | Testrail-report-18 (PDF) | Edit Phy (MP4) |
| IM with Kevin (JPG) | Testrail-report-20 (PDF) | Wheel Auto Num (MP4) |
| IM Kevin 2(JPG) | 1 (MP4) | |
| QA Audit (PNG) | 2 (MP4) | |
| IM Kevin 3 | 2019-09-30_13-49-471 (MP4) | |
| 2019-05-24_15-18-25 (PNG) | 2019-09-30_14-10-02 (MP4) | |
| Aha Screen Capture (PNG) | STO Loco SUID Dif (MP4) | |
| Rick Implementation grp remark (PNG) | Demo System (MP4) | |

**Product:**

| | | |
|---|---|---|
| Arcc10.1 | Arcc10.1.1 | Arcc10.x.x |
| arcc v10.1 Release Notes and Specifications 7-8-19 (word) | arcc v10.1.1 features and capabilities - detailed description (word) | arcc v10.X.X Release Notes and Specifications 9-6-19 (word) |
| arcc10.1 Features - Requirements and Specificiation 7-8- 19 (Exl) | arcc10.1.1 Release Planning Specifications 9-6-19 Exl) | arcc10.X.X Release Planning Specifications 9-6-19 (Exl) |
| arcc10.1 Features - Requirements and Specificiation LISA 0918notes (EXL) | | |
| Release notes (word) | | |

Checksum (png)
Clinical worklist (PNG)
████████████ (MP4)
████████████████ (PNG)
Dob in order summary screen (png)
Ldap grp dele (png)

Object import body part and side of body (png)
Create dicom dest (png)
Accession details (png)
Ct thumbnail (Png)
CV cath frames dicom study (MP4)

| | |
|---|---|
| ████████████ | PNG File |
| █████████████████ | MP4 File |
| anatomy landing vid | MP4 File |
| Anatomy Org drop down list | PNG File |
| anatomy video | MP4 File |
| assign cilm rule to storage via ou live tile | PNG File |
| auto num wheel new 1 | PNG File |
| auto num wheel new | PNG File |
| ██████████ | PNG File |
| cancel | PNG File |
| ████████████████████ | PNG File |
| ████████████ | MP4 File |
| clinical timeline | MP4 File |
| corrected sto location diff suid and series | MP4 File |
| create order show non physicians | PNG File |
| ██████████ | PNG File |
| ██████████████ | PNG File |
| DICOM Config | PNG File |
| dicom content view audit from visual audit icon in vie... | PNG File |
| ████████ | PNG File |
| dicom device ae edit | PNG File |
| orgin key image note | PNG File |
| ████████████████ | PNG File |
| ████████████████ | PNG File |
| OU | PNG File |
| phy HIS ID question | PNG File |

| | |
|---|---|
| dicom device name edit | PNG File |
| ████████ | PNG File |
| dicom store folder structure | PNG File |
| DOB new order | PNG File |
| dup move rule | PNG File |
| dup nondicom device | PNG File |
| edit dicom dest | PNG File |
| Edit Phy | MP4 File |
| ██████ | PNG File |
| ██████████ | PNG File |
| global config landing page | PNG File |
| ████████ | PNG File |
| k im note | PNG File |
| login time | MP4 File |
| ███████████████ | PNG File |
| █████████████████ | PNG File |
| ████████████ | PNG File |
| move study dicom header | PNG File |
| move study on accession number | PNG File |
| move study on mrn | PNG File |
| no store loc corrected. | PNG File |
| no store location assigned | PNG File |
| no store QA created gender different | PNG File |
| ███████████████████ | PNG File |
| orders grpah | PNG File |

| File | Type |
|------|------|
| 9-25-19 Arcc Vault Wireframes | Adobe Acrobat Document |
| 2019-05-24_15-18-25 | PNG File |
| 2019-10-02_9-41-28 | PNG File |
| 20190916_204941 | JPG File |
| 20190916_204952 | JPG File |
| 20190916_205000 | JPG File |
| Aha Thor v10.0 features list 1.21.18 | Microsoft Excel Worksheet |
| arcc v10 x features checklist | Microsoft Excel Worksheet |
| arcc v10 x features checklistv2 | Microsoft Excel Worksheet |
| arccIT project Information 9 16 19 - JC | Microsoft Word Document |
| Business Stratgey Plan Synopsis | Microsoft Excel Worksheet |
| image001 | PNG File |
| image004 | PNG File |
| image006 | PNG File |
| Sales Plan | Compressed (zipped) Folder |
| Sales Strategy Plan SY2020 v2 | Microsoft Word Document |

| File | Type |
|------|------|
| 9-25-19 Arcc Vault Wireframes | Adobe Acrobat Document |
| 2019-05-24_15-18-25 | PNG File |
| 2019-10-02_9-41-28 | PNG File |
| 20190916_204941 | JPG File |
| 20190916_204952 | JPG File |
| 20190916_205000 | JPG File |
| Aha Thor v10.0 features list 1.21.18 | Microsoft Excel Worksheet |
| arcc v10 x features checklist | Microsoft Excel Worksheet |
| arcc v10 x features checklistv2 | Microsoft Excel Worksheet |
| arccIT project Information 9 16 19 - JC | Microsoft Word Document |
| Business Stratgey Plan Synopsis | Microsoft Excel Worksheet |
| image001 | PNG File |
| image004 | PNG File |
| image006 | PNG File |
| Sales Plan | Compressed (zipped) Folder |
| Sales Strategy Plan SY2020 v2 | Microsoft Word Document |

| | |
|---|---|
| Gmail - Comp, Shares and Titans Again | Adobe Acrobat Document |
| Gmail - dd | Adobe Acrobat Document |
| Gmail - FW_ Apollo ARCC DEV install | Adobe Acrobat Document |
| Gmail - FW_ arcc login page | Adobe Acrobat Document |
| Gmail - FW_ arccSovera Meeting | Adobe Acrobat Document |
| Gmail - FW_ arccV10.0.1 Testing Update | Adobe Acrobat Document |
| Gmail - FW_ arccV10.1 Spreadsheet | Adobe Acrobat Document |
| Gmail - FW_ Catchup | Adobe Acrobat Document |
| Gmail - FW_ Current status | Adobe Acrobat Document |
| Gmail - FW_ Development | Adobe Acrobat Document |
| Gmail - FW_ ██████ | Adobe Acrobat Document |
| Gmail - FW_ features_reqs in Aha | Adobe Acrobat Document |
| Gmail - FW_ ██████ | Adobe Acrobat Document |
| Gmail - FW_ Lunch with Apollo | Adobe Acrobat Document |
| Gmail - FW_ open issues in ██████ TAB 2 | Adobe Acrobat Document |
| Gmail - FW_ open items in TAB 1 | Adobe Acrobat Document |
| Gmail - FW_ Product Development | Adobe Acrobat Document |
| Gmail - FW_ Quick question | Adobe Acrobat Document |
| Gmail - FW_ Requirements Gathering | Adobe Acrobat Document |
| Gmail - FW_ RFP | Adobe Acrobat Document |
| Gmail - FW_ Sales Plan | Adobe Acrobat Document |
| Gmail - FW_ Sales Plans and Materials | Adobe Acrobat Document |
| Gmail - FW_ TAB 3, 4, 5 STATUS | Adobe Acrobat Document |
| Gmail - FW_ Testapp2 | Adobe Acrobat Document |
| Gmail - FW_ Testing update | Adobe Acrobat Document |
| Gmail - FW_ touchbase | Adobe Acrobat Document |
| Gmail - FW_ Travel itineraries and meetings | Adobe Acrobat Document |
| Gmail - FW_ Update req'd for Paul's Service | Adobe Acrobat Document |
| Gmail - FW_ Update | Adobe Acrobat Document |
| Gmail - FW_ V10.1 | Adobe Acrobat Document |
| Gmail - Fwd_ arccIT | Adobe Acrobat Document |
| Gmail - Fwd_ Follow up from this wks wireframe reviews | Adobe Acrobat Document |
| Gmail - Fwd_ IP Audit _ Request for Info _ 27 SEP 2019 | Adobe Acrobat Document |
| Gmail - Fwd_ My personal site ground account | Adobe Acrobat Document |
| Gmail - Fwd_ New Website | Adobe Acrobat Document |
| Gmail - Fwd_ ██████'s innovation strategy_ 'You cannot b... | Adobe Acrobat Document |
| Gmail - Fwd_ Update and Question | Adobe Acrobat Document |
| Gmail - Fwd_ | Adobe Acrobat Document |
| Gmail - HIIE Business Strategy Plan Synopsis | Adobe Acrobat Document |
| Gmail - My Personal Email and IP doc | Adobe Acrobat Document |
| Gmail - Need some clarification | Adobe Acrobat Document |
| Gmail - Need to Talk, need some advice and guidance | Adobe Acrobat Document |
| Gmail - RE_ release notes | Adobe Acrobat Document |

# Exhibit G

| | |
|---|---|
| **From:** | Susan Metcalfe |
| **To:** | Susan Metcalfe |
| **Subject:** | FW: Following our conversation |
| **Date:** | Friday, December 6, 2019 7:21:21 AM |
| **Attachments:** | image001.png |
| | image004.png |
| | image001.png |
| | image004.png |

**From:** James Conyers <james.conyers1975@gmail.com>
**Sent:** Friday, November 15, 2019 7:05 PM
**To:** Mark J. Newburger
**Subject:** Re: Following our conversation

Mark,

It was great to talk to you today. The synergy with Apollo would be great around the key focus of a pathology solution like - arccClinical as we discussed and potentially the use of your mobile application since it is already integrated into arccClinical and would allow me not to have to dedicate resources to integrate ours. Further the synergies between your core products would provide resource allocation benefit. I want to make sure we are on the same page. I am not looking for improved VNA functionality. In fact we would need to to bring some of our functionality to your VNA from what already exist in our solution.  I was looking at it from a integration simplicity standpoint not a feature standpoint. I figured we could work all that out as we moved forward.

Your last paragraph will need to be addressed prior to me moving forward with these talks. I have reached out to Catherine multiple times now with no response. I assumed because of that everything was completed as she outlined. Otherwise I probably would not have reached out. I have reviewed the confidentiality and innovation agreement with my attorney and my new companies attorney. If you feel you need to send me something additional please do so I have no issue with that. My address is below.  I hope your attorneys can get in touch with me before Tuesday of next week and conclude any issues they may seem to believe is remaining. I will be unavailable most of next week. Until that is complete and signed off I will not be able to move forward with our discussions.  Therefore I look forward to getting that completed so we can continue discussions.

There are dozens of mobile applications and solutions on the market for clinical departments and mobile capture. We already have a mobile application. As well, as I mentioned on our call we have clinical solutions as well. I did not provide you a complete list of our clinical specific applications we provide. My path for the two specific things we need to improve on in our existing solution is to partner rather then continue the already in progress development and free up those resources as I mentioned to provide value to our customers sooner in 2020 and reallocate to our AI products.

Again Thank you for speaking with me today. I do think there is really good potential. I thought everything was all good between us and done. Janet had emphasized that as well and that is why I reached out.

Either way. Thank you for your time. I look forward to hearing what the next step is in getting your

attorneys to complete what they need so we can move forward.

Take Care Mark

Jim

██████████████

Wellington CO ███

On Fri, Nov 15, 2019 at 6:05 PM Mark J. Newburger <mnewburger@apolloei.com> wrote:

Jim:

Thanks for the call today. As I said, I'm willing to learn more about your proposal for some sort of collaboration between Apollo and your new employer to fill its need for the Clinical and Mobile solutions that Apollo offers along with improved VNA functionality. I'm glad to hear your confidence in Apollo's arcc product leads you to believe it would be a good option.

Obviously, I'll need to know the name of the company in order to evaluate how our product could fit into your new company's current offerings. The sooner I'm able to do that, the more productive we can be during our scheduled November 26th call and RSNA meeting. You indicated you've agreed to keep the name of your new employer confidential until a press release is issued on November 25. I certainly would agree to keep the information confidential ahead of that. Let me know.

Also, as a heads-up, I expect our attorneys will be following up with you on various issues, including your confidentiality agreement. The fact that you're reaching out on a potential collaboration with Apollo gives me comfort that your role at your new company is not to develop a product that competes with arcc – which, in my view would be impossible to do without using Apollo's confidential information. But of course our lawyers have to do their jobs in protecting Apollo's interests.

Sincerely,

Mark

Mark J. Newburger
President & CEO
Apollo Enterprise Imaging Corp
Office 703.288.1474 x102
Direct 703.260.1849

Visit us at RSNA Dec. 1-5 in <u>Booth 8113</u>





****************** Internet Email Confidentiality ******************

The information contained in this message (including any attachments) may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that it is strictly prohibited (a) to disseminate, distribute or copy this communication or any of the information contained in it, or (b) to take any action based on the information in it. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

# Exhibit H

| | |
|---|---|
| **From:** | Susan Metcalfe |
| **To:** | Susan Metcalfe |
| **Subject:** | FW: Touchbase |
| **Date:** | Friday, December 6, 2019 7:26:47 AM |

**From:** James Conyers <james.conyers1975@gmail.com>
**Date:** November 19, 2019 at 8:12:06 PM EST
**To:** Catherine Guttman-McCabe <cguttman-mccabe@potomaclaw.com>
**Subject: Re: Touchbase**

⚠ **EXTERNAL**

Dear Catherine: Thank you so much for your response.

What I provided you on the thumb drive is every thing I had. I do not have anything outside of that in my personal possession. I did not have admin rights to the corporate One note, One Drive, SharePoint or other. In addition, all of those are controlled with version control and controlled by the corporate Admin. Everything I had was in my Apollo onenote, onedrive, sharepoint or on my work computer. My Work Computer was left on my desk. What happen after I left the office I have no idea. I am not sure what else I can provide or explain on the matter. I wish I could be of further assistance.

Next, as for the poster boards, again I apologies I can not be of further assistance but I do not have those poster boards. Those poster boards have zero value or purpose to me. Jeff M allowed Jeff B and Jarred to store their personal furniture, household items, boxes etc throughout the office. As I mentioned before those boards were scattered all throughout the office and among their personal items. I have no idea where those poster boards are. Again, I wish I could be of more assistance.

I have done everything in power to be cooperative.

Thank you for your time and your response.

Sincerely

Jim

On Tue, Nov 19, 2019 at 4:35 PM Catherine Guttman-McCabe <cguttman-mccabe@potomaclaw.com> wrote:

Hi, Jim. Thanks for following up. Apollo has completed a review of your computer, One Drive for Business in the cloud, and the USB thumb drive that you sent. They looked for the notes, designs, customer proposals, presentations etc. that they

expected to find, but these items were not there. For example, on 2 August 2019 you forwarded the following document to Mark: PHX Childrens POC US Scope.doc; but this document does not appear on your hard drive, One Drive, or the thumb drive. This is one example of many. In addition, Apollo searched the Colorado office, but did not find the poster boards or pictures of the poster boards. Please check your files again and return any remaining Company information or provide us with further explanation as to what happened to these items.

You have advised Apollo that you have accepted another employment position, and that you have reviewed the Confidentiality and Inventions Agreement you signed ("Agreement") with your new employer's attorney as well as your own. Please share this email with your attorney as well. We expect that you have complied and will continue to comply with your contractual and other legal obligations; that you will not use or disclose Apollo's trade secrets and confidential and proprietary information; and that you will not interfere with Apollo's business relations with its customers and employees. Until you direct otherwise and provide your counsel's name and contact information, I will continue to communicate with you directly.

We wish to emphasize certain provisions of the Agreement. Under the Agreement, you must return to the Company any Confidential Information in your possession. You must continue to protect the confidential and proprietary nature of Confidential Information and prevent its inadvertent or unauthorized disclosure. Since your employment has ended, you may not use, copy, or disclose any Confidential Information for any purpose. See Section 1(b).

Your obligations under Sections 1, 2, 3, and 4 of the Agreement continue after the termination of your employment with Apollo, including, without limitation, non-solicitation obligations with respect to customers and employees of the Company. Please review those provisions carefully. In addition to the Agreement, state law prohibits you from disclosing Apollo's confidential or trade secret information.

**Catherine R. Guttman-McCabe** | Partner | Potomac Law Group, PLLC
1300 Pennsylvania Avenue, NW, Suite 700
Washington, D.C. 20004
Telephone: (202) 262-7083 | Fax: (202) 318-7707
cguttman-mccabe@potomaclaw.com | www.potomaclaw.com

This e-mail and any attachments may contain information that is private, confidential, and/or privileged. If you are not the intended recipient, please notify us immediately and destroy all copies of this message and any attachments.

---

**From:** James Conyers <james.conyers1975@gmail.com>
**Date:** Friday, November 15, 2019 at 8:54 AM
**To:** "cguttman-mccabe@potomaclaw.com" <cguttman-mccabe@potomaclaw.com>
**Subject:** Fwd: Touchbase

⚠ **EXTERNAL**

Catherine,


Good morning. I am circling back again to get an update. I have done everything in my power to be cooperative.


I am looking forward to your response.


Please have a wonderfully beautiful day


Jim

---------- Forwarded message ---------
From: **James Conyers** <james.conyers1975@gmail.com>
Date: Wed, Nov 13, 2019 at 10:45 PM
Subject: Touchbase
To: Catherine Guttman-McCabe <cguttman-mccabe@potomaclaw.com>


Catherine,

I hope all is well with you. I have not heard anything else in sometime now. I have complied with everything asked of me including working with Lisa and an outside contractor to help them get the website content several times now. I have done everything to ensure any and all Apollo content was returned and documented as part of my resignation. I have no desire to have any of this content in my possession or on my hosting platform any further. Please provide an update so that I understand what my my next steps will need to be.

Thank you again for your attention and help in concluding this mater.

Sincerely,

Jim Conyers